## WALTER A. WOOD MOWING & REAPING MACH. CO. v. VANSTORY.

(Circuit Court of Appeals, Fourth Circuit.   June 9, 1909.)

### No. 874.

1. BANKRUPTCY (§ 140*)—TITLE AND RIGHTS OF TRUSTEE—PROPERTY HELD BY BANKRUPT AS BAILEE.

Petitioner, a manufacturer of farm machinery, shipped machines by the car load to the bankrupt, which was a hardware company, under a contract by which the bankrupt received and stored the same and from time to time shipped machines out on orders from petitioner. The machines were not charged to the bankrupt, nor invoiced as part of its stock, but it was paid an agreed price for storage and transfer. It had the privilege of selling any of the same to its own customers, and machines, when so sold, were charged to it. At the end of the year an inventory was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

taken by petitioner of the machinery then on hand in storage. *Held*, that the transaction was a bailment, the title remaining in petitioner, and that on the bankruptcy it was entitled to reclaim possession of the machines on hand from the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 140*)—DEFINITIONS—"TRANSFER."

The definition of "transfer," in Bankr. Act July 1, 1898, c. 541, § 1a (25), 30 Stat. 544 (U. S. Comp. St. 1901, p. ·3420), as including "the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally as a payment, pledge, mortgage, gift or security," does not apply to a bailment.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*

For other definitions, see Words and Phrases, vol. 8, pp. 7064–7070; vol. 8, p. 7819.]

3. BANKRUPTCY (§ 140*)—TITLE AND RIGHTS OF TRUSTEE—PROPERTY HELD BY BANKRUPT AS BAILEE.

Bankr. Act July 1, 1898, c. 541, § 70a(5), 30 Stat. 565 (U. S. Comp. St. 1901, p. 3451), vesting a trustee with the title of the bankrupt to all "property which * * * he could by any means have transferred or which might have been levied upon or sold under judicial process against him," does not undertake to vest the bankrupt with title to property to which he had no title prior to his adjudication, but only relates to property the title to which he had acquired to such an extent as to render the same liable to seizure and sale under execution for his debts, and does not include property which he held as bailee only, although he may have had an option to purchase any part of the same at any time.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

4. BANKRUPTCY (§ 140*)—TITLE AND RIGHTS OF TRUSTEE—CONSTRUCTION OF CONTRACT.

A contract under which petitioner furnished certain machines to the bankrupt, and which provided that all goods on hand and the proceeds of all sales of goods received under the contract, whether consisting of notes, cash, or book accounts should be held by the bankrupt as collateral security in trust for the benefit of petitioner and subject to its order until all obligations due it thereunder should be paid in full, was not one of conditional sale, but one creating a trust for the benefit of petitioner, and on the bankruptcy it was entitled to reclaim the goods on hand from the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

Appeal from the District Court of the United States for the Western District of North Carolina, at Greensboro, in Bankruptcy.

This is an appeal from an order of the District Court sitting as a Court of Bankruptcy of the United States for the Western District of North Carolina, approving and confirming the report of the special master herein, and dismissing appellant's petition for the possession of certain machinery in the hands of the trustee in bankruptcy of the Wakefield Hardware Company.

The petition alleged: That, for a number of years and up to the filing of the petition of bankruptcy, the Wakefield Hardware Company acted as agent for the appellant for the storage and transfer of certain mowing and reaping machinery; that the Wakefield Hardware Company agreed to receive machinery belonging to the appellant, to store the same, and to ship the same out on the order of the appellant to parties whom appellant should designate; that it was agreed by the appellant that the Wakefield Hardware Company should receive a fixed compensation for this service; that, in accordance with this agreement, machinery was, from time to time, to be delivered by the appellant to the Wakefield Hardware Company to be held according to the terms of the said agreement; and that certain machinery now in the possession of the trustee in bankruptcy of the Wakefield Hardware Company, and

easily capable of identification, was acquired by virtue of this contract to be stored and reshipped according to the terms thereof.

The petition further alleged: That, in September, 1906, the appellant entered into written contracts with the Wakefield Hardware Company, promising to sell and deliver to the said company certain machinery, but on the express condition and trust that all such machinery and the proceeds of all sales thereof, whether the same consisted of notes, cash, or book accounts, should be held by the Wakefield Hardware Company as collateral security in trust and for the benefit of and subject to the order of the appellant, until all indebtedness due said appellant by the Wakefield Hardware Company should be paid in full in cash; that certain machinery was delivered to the Wakefield Hardware Company in pursuance of the terms of this contract; and that certain pieces of the said machinery, described in the petition and easily capable of identification, are now in possession of the trustee in bankruptcy.

The petition prayed that the trustee in bankruptcy might be ordered to turn over to the appellant both the machinery which had been received by the Wakefield Hardware Company for the purpose of storage and transfer and also the machinery which had been received by the said company in accordance with the contracts of September, 1906, and which was described in said contracts, and which by the agreements in said contracts was held in trust for the benefit of and subject to the order of the appellant.

John J. Parker (David Stern, on the brief), for appellant.

Thomas S. Beall and Robert R. King (Scott & McLean and King & Kimball, on the brief), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and DAYTON, District Judge.

PRITCHARD, Circuit Judge (after stating the facts as above). In passing upon the question sought to be determined by this appeal, it will only be necessary to consider the third and fourth assignments of error.

The third assignment of error relates to the property described in the first section of the petition, which reads as follows:

"That for a number of years and up to the time of filing of petition of bankruptcy herein, the Wakefield Hardware Company acted as agent for your petitioner for the storage and transfer of certain mowing and reaping machinery. That the Wakefield Hardware Company contracted with your petitioner to safely and securely keep certain mowing and reaping machinery for your petitioner and deliver the same to your petitioner or its agent on request. That your petitioner under said agreement has stored with the Wakefield Hardware Company for safe-keeping, and the said Wakefield Hardware Company has received for storage and safe-keeping, the following mowing and reaping machinery, all manufactured by the Walter A. Wood Mowing & Reaping Machinery Company, to wit: 5 mowers; 5 self-dump rakes; 6 hand-dump rakes less 1 set teeth and 1 wheel; 2-8-18 disc harrows; 3-10-20 disc harrows; 3-8-20 disc harrows; 5-10-20 disc harrows; 3-3 horse attachments; 13-2 horse attachments; 14 spike-tooth harrows; a lot of machinery repairs, consisting of a large number of nuts and bolts, amounting in value to $276.21, which said repairs are separated in boxes and bins in the store of the Wakefield Hardware Company. That all of the above-described machinery and repairs is on the second floor and in the basement of the store on North Elm street, Greensboro, N. C., formerly occupied by the bankrupt, and all is easily capable of identification as property of your petitioner. That your petitioner promised to pay the Wakefield Hardware Company as storage and transfer charges the sum of $1 on each mower, and the sum of 50 cents on each rake, and the sum of 50 cents on each disc harrow, and the sum of 25 cents on each spike-tooth harrow, all of which your petitioner is willing and ready to pay as soon as its rights herein are determined."

The special master in his report, in dealing with the property described in the first paragraph of the petition, among other things, announced the following conclusions of law:

"First. It is contended by the petitioner: That the contract between it and the bankrupt in regard to the machinery described in the first finding of fact was one of bailment, and, at most, that of agency. That while the bankrupt could dispose of any machines described in the first finding of fact to its own customer at any time it saw fit without reporting the sale to the petitioner, that this was merely for convenience, and that the sale was made as the agent of the petitioner, and that the title had never passed to the bankrupt.

"In my opinion the facts do not bear such construction. The evidence is that the bankrupt was permitted by the petitioner to carry insurance in its own name, and for its own benefit, upon the machines. The bankrupt had a right to sell any machines at any time it saw fit to its own customer upon its own terms and use the proceeds as its own without reporting the sale or either remitting the proceeds to the petitioner. There is not evidence that it was allowed any commission upon such sale. It was not required to account for such machines so sold until the time of annual settlement. If it failed to account for the machines so sold, the only remedy of the petitioner would have been a civil action for debt. These facts, in my opinion, establish the relation of debtor and creditor and pass the title from the petitioner to the bankrupt."

This presents squarely the question as to whether the contract by which this property was transferred comes within the definition of a "bailment." Therefore it is essential that we should correctly determine as to what constitutes a "bailment." The following definition is to be found in the American & English Encyclopædia of Law (2d Ed.) vol. 3, p. 733:

"Bailment is the delivery of goods for some purpose, upon a contract, expressed or implied, that after the purpose has been fulfilled they shall be redelivered to the bailor or otherwise dealt with according to his directions, or kept until he reclaims them." 2 Blackstone, Commentaries, 451; Story on Bailments (9th Ed.) par. 2.

It is well settled that a bailment merely transfers the possession of the property, the absolute title of which is retained by the owner, who has the right to dispose of the same as he may see fit.

It appears from the evidence that the machines to which reference is made in section 1 of the petition were received from the petitioner by the bankrupt, with the distinct understanding that they were to be stored by it and held as the property of the petitioner, and as such were to be subject to the order of the petitioner at all times.

Mr. Starke, a representative of the Walter A. Wood Mowing & Reaping Machine Company, testified on behalf of the petitioner as follows:

"Q. State to the court the general course of business between Walter A. Wood and the Wakefield Hardware Company that you had as a personal auditor. A. I will try to make the method of business as clear as I can. We send out travelers as in this case, who call upon these men, and these dealers, and in this particular instance the Wakefield Hardware Company, they were approached by our traveling man as had been his custom for 18 or 20 years, representing us here in this same capacity. There is a contract drawn up with the Wakefield Hardware Company, in which they agree to purchase a certain number of machines, and years ago it was our custom for them to draw up what we called a 'transfer and storage agreement'; but in these latter years we have not gone to that trouble. Everybody

thoroughly understood it, and if the Wakefield Hardware Company for instance should have ordered, say, a half dozen machines, we would have shipped down there a car load of machines. The Wakefield Hardware Company appreciated the fact that in that car load were these half dozen machines which were theirs by purchase which was set forth in contract which will be taken up later. And the remainder of those machines were left with the hardware company on storage account to be used by the Walter A. Wood Company later on; that is to say, if a man over at Winston, which we call a local agent, was to write us to ship him a machine, rather than to ship it from Hoosic Falls, to furnish him quicker and save freight charges, then we would send an order to the Wakefield Hardware Company to ship the Brown, Rogers Hardware Company at Winston a certain machine out of the Walter A. Wood's stock held by them on storage account. When they did that, we furnished the Wakefield Hardware Company a pad, which I have a sample of here, and, as soon as the Wakefield Hardware Company would make that shipment, they would make out these three blanks in triplicate, and save this one (illustrating). These two (illustrating) come to us, and after the record is made in Richmond one of them is sent to Hoosic Falls and one sent to Brown, Rogers & Company, so the whole account checks. Now that is really about the sum of all that. The Wakefield Hardware Company are called upon later on to make settlement of their account. When the man comes here to make a settlement, he goes into the Wakefield Hardware Company and makes an inventory of what is there. He already has an inventory of what machines have been ordered out and what shipments have already been made, and he adds those things together, and, if he finds that they do not yet account for the total number of machines that have been shipped to the Wakefield Hardware Company, then he calls on the Wakefield Hardware Company to make a statement."

Also C. R. Hudson, a witness for the petitioner, who was secretary and treasurer for the Wakefield Hardware Company on the day of its adjudication as a bankrupt, testified, among other things, as follows:

"Q. Now, Mr. Hudson, was there any agreement either verbal or written between your company and the Walter A. Wood Company about storage and transfer? If the agreement was written, say so, and if it was verbal, say so. A. There was a verbal agreement.

"Q. There was a verbal agreement between your company and the Walter A. Wood Company as to storage and transfer of machines? A. Yes, sir.

"Q. Will you tell the court what the agreement was? A. That we fill orders when sent to us from Hoosic Falls or from Mr. Starke at Richmond, from anything we had in stock. We also had a list of customers of the Walter A. Wood Company for whom we filled any of their orders as those order blanks will show, reporting same to the Richmond office always.

"Q. Out of what machines would you ship orders under the storage and transfer account? A. From the stock account when we had it.

"Q. Now, is any of that stock account represented in the items charged on your ledger book? A. No, sir."

Thus we have clear and concise statements from a representative of the petitioner and from a representative of the bankrupt as to the nature of the contract, and these statements strongly support the contention of the petitioner as to the true intent and meaning of the contract.

It further appears from the record that from time to time the bankrupt, acting under the directions of the petitioner, shipped various kinds of machinery held under this contract to parties residing in different territories and made reports of such shipments to the petitioner, and that the only compensation the bankrupt received on account of such shipments was the several amounts paid him by the petitioner for storage and transfer. The sole record kept by the bankrupt of this ac-

count consisted of a triplicate report showing the transaction, a copy of which was transmitted to the petitioner, one to the consignee and the third retained by the bankrupt. It also appears, from the correspondence introduced as evidence in the court below, that the bankrupt was required to render to the petitioner at stated intervals reports showing the exact amount of machinery on hand, and that at the end of the year the petitioner's agent took an inventory of the machinery thus stored by the bankrupt, and it is clear that at no time was there any demand made for the payment of any sum on account of such stock.

It appears that the bankrupt made annual statements showing all the property and assets it owned at the time such statements were made, and it was shown that none of this machinery was included in any of these statements. It was also shown that the bankrupt occasionally disposed of these machines held under this contract, and, in each instance, the machines thus disposed of were charged to the bankrupt. In some cases, however, appropriations of this kind were not shown until the yearly inventory was taken, at which time the bankrupt was required to make settlement for the same.

A careful consideration of all the evidence in this case leads us to the conclusion: That, in this instance, the bankrupt entered into an agreement with the petitioner by which it agreed to store certain car loads of machinery and hold the same subject to the order of the petitioner, and, among other things, agreed to ship the machinery thus stored to the various customers which the petitioner might secure in the immediate section in which the bankrupt was engaged in business; that in addition to the making of these shipments, under the directions of the petitioner, the bankrupt was authorized to purchase from the petitioner such machines from this lot as it might be able to dispose of to its regular customers. This agreement went no further than to give the bankrupt an option to purchase, upon the happening of a contingency, the happening of which depended more or less upon the demand for such articles, in the course of trade in which the bankrupt was at the time engaged; a list of prices being adopted to cover the charges for storage and drayage, all of which charges were promptly paid by the petitioner in consideration of the services performed by the bankrupt in storing, handling, and transferring this particular lot of machinery.

In order to correctly determine as to whether title to property passes under a given contract, it becomes necessary to ascertain the intention of the parties, at the time the contract was made. In this instance it was evidently the intention of the parties that the petitioner should not part with the title to such property, and that the bankrupt was only to be given the right of possession in accordance with the terms specified in the contract. The title to the property being in the petitioner, and being held by the bankrupt as the agent of the petitioner, it necessarily follows that there was no transfer of the title to the bankrupt, and that it held possession of the property for the sole use and benefit of the petitioner, merely acting as his agent for such purpose, and none other. The fact that the bankrupt was given an option to purchase a portion of this property did not change the nature

of the contract, by virtue of which the property was stored with the bankrupt as hereinbefore stated; it having no more right to the property by virtue of its being in its possession than it would have had, had the property been in the hands of the petitioner or some other party, inasmuch as it was clearly the intention of the parties that the petitioner was to retain title to the property. Even if the bankrupt had an option to purchase the entire lot of machinery deposited with it, under the circumstances, with the conditions attached as in this instance, the granting of the option on the part of the petitioner could not have the effect of converting the bailment into a sale, nor could it vest the bankrupt with the title to the property.

In the case of Foreman v. Drake, 98 N. C. 311, 3 S. E. 842, Judge Merrimon, who delivered the opinion of the court, said:

"* * * * The mere fact that it is stipulated that the defendant Andrews might put an end to the term of hiring, if the compensation should not be paid at the several times specified, or for the causes mentioned, could not change the nature of the contract, nor does such a stipulation have the effect to render the transaction a conditional sale of the property. There is no reason why the contract of hiring should not have conditions, upon the happening of which it shall or may be terminated; nor does the stipulation that the feme defendant might purchase the furniture during the term of the hiring, affect the nature of the contract. We can see no reason why it should. It might be that the course of fortunes of her business would lead or enable her to do so—it might be otherwise. Moreover, this stipulation goes to show that the parties did not contemplate a sale by the contract of any kind or nature. By the terms of the agreement the feme defendant had the right at any time during the term of hiring to purchase the property for a price, substantially the sum of money agreed to be paid as compensation for the use of the property. This seems to be a singular stipulation, and suggests a want of good faith in some way; but of itself it cannot change the nature and defeat the purpose of the contract. There may be some reason for it that we do not see. It is not suggested, nor does it appear, that the whole transaction was a sham and a fraud. We pass upon the instrument as it appears by its face. A contract of 'conditional sale,' and a contract of hiring, conditional in its provision, are essentially different in their respective natures and purposes. The latter need not be in writing, and when it is it need not be registered. The former to be effectual against creditors and subsequent purchasers for value, must be in writing and registered. Code, § 1275." Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093.

In a note to Sturm v. Boker, 37 L. Ed. 1094, it is said:

"A bargain of sale or return, in the strict sense, which is subject to a condition subsequent rendering the contract defeasible after delivery of the chattel, is to be distinguished from a transaction which amounts to a mere bailment with the privilege of purchase."

Also, in the case of Chamberlain v. Smith, 44 Pa. 431:

"The delivery of cattle to be kept and used for a certain time and then to be returned, the hirer having the privilege of purchasing them at a stipulated price, is a bailment and not a conditional sale of the cattle."

In the case of In re Columbus Buggy Company, 143 Fed. 861, 74 C. C. A. 612, Circuit Court of Appeals for the Eighth Circuit, in an opinion delivered by Judge Sanborn, among other things, said:

"An agreed price, a vendor, a vendee, an agreement of the former to sell for the agreed price and an agreement of the latter to buy for and to pay the agreed price are essential elements of a contract of sale. The contract involved in this case has none of these characteristics. The power to require the restoration of the subject of the agreement is an indelible incident

of a contract of bailment. South Australian Ins. Co. v. Randell, L. R. 3 P. C. 101, 108; 2 Kent's Com. 589; Powder Co. v. Burkhardt, 97 U. S. 116, 24 L. Ed. 973; Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093. This contract contains a plain stipulation that the goods are at all times subject to the order of the Columbus Company until they are sold, and that at the expiration of the term of the contract the Washburn Company will return the goods which remain unsold. It was therefore a contract of bailment for sale, and it was not subject to the statute of Oklahoma regarding conditional sales. One of the most striking and familiar illustrations of its character is given by Chief Justice Gibson in McCullough v. Porter, 4 Watts & S. (Pa.) 177, 39 Am. Dec. 68, where he says: 'Were I to put my horse in the custody of a friend, to be sold for a designated sum, with permission to retain whatever could be got beyond it, it would not be suspected that I had ceased to own him in the meantime, or that my friend would not be bound to return him, even without a stipulation, should he have failed to obtain the prescribed price.'

"A contract between a furnisher of goods and the receiver that the latter may sell them at such prices as he chooses, that he will account and pay for the goods sold at agreed prices, that he will bear the expense of insurance, freight, storage, and handling, and that he will hold the unsold merchandise subject to the order of the furnisher, discloses a bailment for sale and does not evidence a conditional sale. It contains no agreement of the receiver to pay any agreed price for the goods. It is not therefore affected by a statute which renders unrecorded contracts for conditional sale voidable by creditors and purchasers. The fact that such a contract provides that the receiver of the goods may fix the selling prices and may retain the difference between the agreed prices of the accounting and the selling prices to recompense him for insurance, storage, commission, and expenses does not constitute the contract an agreement of sale. It still lacks the obligation of the receiver to pay a purchase price for the goods and the obligation of the furnisher to transfer the title to him for that price."

It is contended by counsel for appellee that under the definition of the word "transfer," found in section 1 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]), the title of this property passed to the bankrupt. The definition in question reads as follows:

"Transfer shall include the sale and every other and different mode of disposition of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift or security."

The definition thus given does not mean that a contract which constitutes a bailment comes within the meaning of the word "transfer" as defined in section 1 of the bankruptcy act. This definition of "transfers" was never intended to apply to a bailment, but only to cases where, from the nature of the contract, the title to the property had become vested in the bankrupt to such an extent as to render it as his property, and as such, liable for the payment of his debts.

Section 70a(5) of the bankruptcy law is relied upon by the appellee in support of its contention. The section in question reads as follows:

" * * * The property, which, prior to the filing of the petition, he could, by any means, have transferred, or which might have been levied upon or sold under judicial process against him."

This section does not undertake to vest the bankrupt with the title to property to which he had no title prior to his adjudication as a bankrupt. It only relates to property, the title to which he had acquired to such an extent as to render the same liable to seizure and sale under execution for his debts, and the right to the possession of which could

be maintained by him upon the strength of such title in a proper proceeding for the recovery of the same. The definition of "transfer" in a legal sense as used here was never intended to apply to "bailment."

Suppose that the petitioner, prior to the adjudication of bankruptcy, had demanded possession of this property, and the bankrupt had refused to surrender it. Can it be reasonably contended that the petitioner, by the institution of proper proceedings, could not have recovered possession of the same? Also, suppose that this property had been destroyed by fire or other casualty while in the possession of the bankrupt and being held under this contract. Could the petitioner have recovered the value of the same from the bankrupt on account of its destruction? Most assuredly not, and why? Because the bankrupt held this property in storage as the property of the petitioner, and there would have been no valid ground upon which the petitioner could have instituted proceedings for the recovery of damages under such circumstances. The question presented is not as to whether, under the option, the bankrupt had a right to purchase a portion of the machines placed in his possession, and, after having purchased the same, transfer them to another; but it is as to whether, under the agreement in question, it was the intention of the parties that the title to the property should become vested in the bankrupt.

While it is true that the bankrupt, under the option which he held to purchase a portion of this stock of machinery, was afforded the right to sell and dispose of the same, yet there was nothing pertaining to the option which could be construed to mean that he had an option to purchase the entire stock, or any particular machines belonging to the stock; but, on the other hand, it clearly appears that, under the option, he only had the right to purchase from the petitioner such machines as he might need on occasions when there was a demand from a customer for machines which he did not have in his own private stock.

The fourth assignment of error reads as follows:

"Fourth. In approving and confirming in all respects the report of the special master herein the court erred, because that the special master held that the contract covering the machines described in section 2 of the petition gave the appellant no lien on the said machines as against the trustee in bankruptcy, and that the said machines passed to the trustee in bankruptcy at the time of the adjudication free from such lien."

The contract under which the machines described in article 2 of the petition were acquired by the bankrupt contained the following provision:

"All goods on hand and the proceeds of all sales of all goods received under this contract, whether such proceeds of sales consist of notes, cash or book accounts, the party of the second part agrees to hold as collateral security in trust and for the benefit of, and subject to the order of the party of the first part, until all obligations hereunder due the party of the first part from the party of the second part are paid in full in cash."

Inasmuch as this court, at the February term, 1909, in the case of Walter A. Wood, Petitioner, v. H. M. Eubank, Trustee of the Implement and Supply Company, Bankrupt, Respondent, 169 Fed. 929, determined the questions involved in this assignment of error, we do not deem it necessary to enter into a further discussion of them. In view

of our ruling in that case, we are of the opinion that the court below erred in holding that the title to the machinery referred to in the fourth assignment passed to the bankrupt.

For the reasons hereinbefore stated, the judgment of the District Court is reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.

Reversed.